Martin, C. J.
 

 Since 1950 Donald Crass lived alone with his dog in a cabin in the town of Sturgeon Bay, Wisconsin. His sister, Mrs. Hazel DeLair, usually saw him once or twice a week and sometimes every two weeks. On the night of March 10, 1955, not having seen Crass for some time, she had two of her sons go to his cabin to see if he was ill. The boys came back without having found Crass, and Mrs. OeLair returned to the cabin with them. They found the door padlocked and they could not locate Crass or his dog. Checking his mailbox on the highway, they found some literature and a letter from a freight company dated March 4th. The DeLairs notified Sheriff Glesner and on March 11th the bodies of Donald Crass and his dog were discovered in the cabin. Both had been shot in the head and wads from a 16-gauge shotgun were recovered from the wounds.
 

 Donald Crass had been unemployed for some months prior to March of 1955. He last registered for unemployment compensation on February 24, 1955, and he would next have registered on March 3d. An unopened envelope containing an unemployment check dated February 28, 1955, was found in the cabin.
 

 The cabin was located on a one-track, sandy road. Crass collected junk and the cabin was cluttered with paper, boxes, war-surplus material, machinery, and scrap of all kinds. Papers were strewn over the floor. The sheriff testified that “Bedding was moved, other articles that were, that he probably had piled up were knocked over, things had been gone
 
 *4
 
 through, probably in a hurry.” He had pried open the padlock on the outside of the door. Inside he found another padlock lying on a Heatrola. Water pails inside the cabin contained frozen water. Crass’ body was dressed in a heavy Mackinaw which was open, a shirt, heavy underwear, trousers, and rubber overshoes. The trouser pockets were pulled out.
 

 Mrs. DeLair testified Crass used a padlock on his front door; that she and her brother had entered the cabin together on various occasions and after removing the padlock it was Crass’ habit to take it into the house and place it on the Heatrola.
 

 At the time the body was discovered, the sheriff saw two blue shotgun shells in the bottom of a box back of the cabin door. When traffic officers made an inventory on March 16, 1955, they took the shells and marked them for evidence. They were taken from the top box of three piled upon each other.
 

 Near the end of March, Sheriff Glesner obtained from Emil Polcen, father of the defendant Alvin Polcen, a shotgun which he took to the crime laboratory for a firearms identification. Later the gun was returned to Glesner, apparently with a report that it had no connection with the crime. It was a 16-gauge, double-barreled shotgun which Emil Polcen had purchased from his son Alvin around March 1st. When he acquired it, there was no hammer on the left barrel and he made a hammer for it.
 

 This gun was thoroughly re-examined in February of 1957, and Charles M. Wilson, superintendent of the crime laboratory, and an employee, Allan Wilimovsky, both testified that the 16-gauge blue shells found in the Crass cabin were fired in the Polcen shotgun, one in each barrel.
 

 Harris Modquin, who had known each of the defendants about six or seven years, testified he saw Alvin Polcen at the National Hotel bar about 10 a. m. on the 2d or 3d of
 
 *5
 
 March, 1955. They drank beer together until about noon and then went in Modquin’s car, Polcen driving, to the Polcen home. On the way they saw a deer. Alvin Polcen went into the house while Modquin stayed in the car, and when Polcen came out he was carrying a break-type shotgun and was loading it with shells that were shiny as if taken out of a box. When he got to the car he put the gun on the floor in the back seat. On the way back to the city they stopped on a small side road to look for the deer but did not see it.
 

 They returned to the National bar and drank more beer. Modquin asked Polcen to remove the gun from the car and put it in the trunk, giving him the car keys to unlock the trunk. Polcen went out, came right back, and then left again to use the car. Modquin remembered Polcen’s returning to the bar at about 4 p. m. He also saw Solomon Peter John at the bar that afternoon, sitting around drinking. Shortly after 4 p. m., Modquin went to the car and laid down. After it was dark, Alvin Polcen and Solomon Peter John entered the car, Polcen at the wheel. They drove out into the country, made a sharp, right turn, passed the Rod and Gun Club and, apparently at the end of the road, turned to the left. After going two or three fifths of a mile the car was turned around, driven back about 100 feet, and stopped.
 

 Polcen and John left the car; Modquin heard the trunk opened and closed; the men walked down the road, past the front of the car. Modquin stayed in the car, partially asleep; he did not keep track of the time. Polcen and John returned, the trunk was opened again and closed, they got into the car and returned to the National bar.
 

 When the three men entered the building, Polcen and John went into the men’s room. Modquin went into the bar and when the defendants did not come he went to the men’s room and found them talking together. Polcen then gave Modquin $12 and “said something to the effect to keep quiet.”
 

 
 *6
 
 All three continued drinking in the bar and about midnight they bought a case of beer and a bottle of whiskey and drove to the home of Donald Lemire. After about ten minutes there, Modquin and Polcen left (Modquin did not see John after they arrived at the Lemire home) and drove to Hunky Denny’s house. There Modquin laid down on a cot and slept until morning. Modquin and Polcen left about 9 a. m. When they got to the car, Polcen asked Modquin to look at his trousers because “he said something about having trouble with a dog.” They drove to the Emil Polcen home where Alvin went into the house; Modquin did not remember that Polcen removed anything from the car. Modquin did not see the Polcen gun again.
 

 Modquin further testified that he met John in the National bar sometime in the summer of 1955. John asked for a ride to a place where he had been working and they had a conversation in the car:
 

 “A.
 
 It was general small talk and then I made the remark or it just come out that I asked if he killed that man.
 

 “Q.
 
 What was his answer?
 
 A.
 
 He said ‘Yes.’ ”
 

 Both had been drinking and at the time Modquin did not think too much about what John said; his statement to John about killing Crass was not made in full seriousness.
 

 Modquin testified Polcen had owed him $20 for a few years before March 2, 1955, and he had asked him for it several times, had asked him “several other times possibly during that same day.” When Polcen paid him the $12 he said “don’t be asking me for that money all the time” and he also said to keep quiet.
 

 Exhibit 1, a drawing of the area surrounding the Crass cabin, shows that one traveling from the city on County Trank TT and making a right turn onto what is known as the Town road would pass the Rod and Gun Club. The Town road ends where it is crossed by the small road on which the
 
 *7
 
 Crass cabin is located. The distance from the end of the Town road to the cabin was testified to be approximately 2,000 feet. The road to the cabin is a sandy, one-track road. As to its condition early in March, 1955, the evidence shows that there was approximately four inches of snow on the ground and it had probably not been plowed. Crass’ sister testified that the condition of the ground, the terrain, and the snow was such that a person would have been foolish to walk in there without overshoes.
 

 Appellants argue that the evidence is insufficient to sustain the convictions. The rule is that if there is any credible evidence which in any reasonable view supports a verdict in a criminal case, it cannot be disturbed on appeal.
 
 Parke v. State (1931),
 
 204 Wis. 443, 235 N. W. 775;
 
 Garrity v. State
 
 (1941), 238 Wis. 253, 298 N. W. 577;
 
 State v. Lombardi
 
 (1959), 8 Wis. (2d) 421, 99 N. W. (2d) 829. Appellants rely on the authorities holding that a defendant has the right on the trial to have his guilt determined by the court as well as the jury and the right upon appeal or writ of error to the deliberate opinion and judgment of this court upon the question whether his guilt was sufficiently proven.
 

 The test of the evidence is that of legal sufficiency. In
 
 Parke v. State, supra,
 
 page 444, this court said:
 

 “This right of a defendant who has been convicted of a crime, after due and proper trial, is clearly established. This right, however, is to the solemn and deliberate judgment of this court and each member thereof, on the question whether his guilt
 
 was
 
 sufficiently proven. In other words, he has the right to demand of this court its solemn and deliberate judgment on the question whether there was adduced upon his trial evidence which, if believed by the jury and rationally considered, was sufficient to prove his guilt beyond a reasonable doubt. This is the extent of this right and the extent of our solemn duty. A defendant has no right to demand that this court and every member thereof be affirmatively convinced of his guilt beyond a reasonable doubt. An appellate court cannot, for obvious reasons, properly function as a trial
 
 *8
 
 court or as a jury. When there is a conflict of evidence the weight thereof is for the determination of the jury. As was recently said in
 
 State v. Hints,
 
 200 Wis. 636, 641, 229 N. W. 54, ‘The power of the court to disturb the finding of the jury ends with the discovery of evidence to sustain the verdict. In the interest of exactness it should perhaps be stated that this rule is subject to two qualifications: One is where the finding of the jury is contrary to established physical facts, and the other is where it is contrary to all of the reasonable probabilities. . . . No rule is more thoroughly established by the decisions of this court than that where conflicting inferences may be drawn from the facts proved, the question is one for the jury. . . . Whatever doubts we may entertain concerning the justice of this verdict, our power to disturb it is limited by established rules of jurisprudence designed to protect the sanctity of findings of fact, a function which constituted society has committed to the jury.’ ”
 

 The evidence shows conclusively that the two 16-gauge blue shells found in the Crass cabin were fired in the Polcen shotgun. Testimony by Mr. Wilson and Mr. Wilimovsky of the crime laboratory was unequivocal in this respect and their opinions were based on detailed technical comparisons of the primer caps of test shells fired in the Polcen gun with the primer caps of the shells found in the cabin.
 

 Appellants argue, however, that there is no proof that the fatal shots came from these shells. Crass (as well as the dog) died as the result of a shotgun wound in the head. Dr. Rogers, the pathologist who performed an autopsy on both bodies, removed shotgun pellets and wads from the wounds. These were examined by the crime laboratory and Mr. Wilson testified it was his opinion, to a reasonable scientific certainty, that the wads were 16 gauge. The two blue shells were found in a box located behind the door in the Crass cabin. When the inventory was taken, the two officers lifted out the contents of this box and found the shells at the bottom of the box. One of the officers testified there
 
 *9
 
 were no other shells found in the box. The other objects contained in the box were large, “of such size that it would have been very easy for a shell to sift down to the bottom.”
 

 From the evidence that there were but two fatal shots fired, that these two blue 16-gauge shells were found in the Crass cabin, that they were fired in the Polcen shotgun, one in each barrel, and that 16-gauge wads were found in the wounds, the jury could reasonably infer that they were the fatal shells. Appellants rely on the faded and discolored appearance of the shells as showing they could not have been the fatal shells. All the record shows — from the testimony of Mr. Wilson — is that fading and discoloration is accentuated by exposure, by removal of the shells from the box in which they are packaged for sale and generally stored. There is no evidence that exposure out of doors is essential to such a change in color.
 

 Alvin Polcen did not testify on the trial. Emil Polcen testified he had only green shells on hand at the time Alvin came to get the gun; that he gave his son some fine shot and a “bunch of slugs.” He testified that Alvin and Modquin came to his home and picked up the gun but he could not recall the date; that Alvin brought the gun back before dark the same day; that, upon being examined at the sheriff’s office shortly after the body was found, he denied that he had a gun; and that on the preliminary hearing he testified he had denied it because he wanted to talk to Alvin first. There is in evidence a photostatic copy of a letter dated March 9, 1957, from Alvin Polcen to his parents in which he denied having anything to do with the Crass murder but said, in part:
 

 “Dear mother & dad.
 

 “Just letting you no how I am here. I feel better now that I had a talk with the D. A. from Sturgeon Bay. You no about what. I don’t no why you and dad can’t remember
 
 *10
 
 dates right. You said that I came and got the gun at noontime on the 2d of March. If you would think right about the time you no that I was home with you and dad that day and that I came and got the gun after the 7th of March and at nite at that it was about 9:30 or so. You was laying down and dad was listening to the radio when I came with Harris with his car and told you that we seen a deer that was in a bad way. Think back and you’ll see that I’m right. You’s nearly put the rope around my neck. You and dad both get down there and get it strait (but for God’s sake don’t tell them that I told you to do this) If you care at all for me you at least should do that . . .”
 

 The credibility of the witnesses was for the jury; it was not required to believe Emil Polcen’s testimony.
 

 Appellants contend that the time of death was not established by the evidence. As recited above, there is evidence that Crass last registered for unemployment compensation on February 24, 1955, and that his next registration day would have been March 3d. The unopened envelope containing the unemployment check dated February 28, 1955, was postmarked at Madison the same day. This was found in the cabin on March 11th. A letter dated March 4, 1955, was found in his mailbox. Plis sister testified “he was particular in picking up his mail;” that the mailman went through between 10 and 11 o’clock in the morning and Crass would pick up his mail in the afternoon. Upon this evidence it was reasonable for the jury to conclude that Crass was killed on March 2, 1955. Appellants attempt to support their argument by the testimony of Dr. Rogers on cross-examination. Pie testified he had been requested to limit his autopsy of Crass’ body to the head; that he found no putrefaction in the body; that he had testified at the preliminary hearing that he could not definitely determine from his examination how long Crass had been dead — “Part of the rigor mortis was still evident in the arms. It seemed to be in the neighborhood of forty-eight hours or so; ” that he later told the district
 
 *11
 
 attorney that,
 
 “I
 
 made a mistake in using this so-called rigor mortis as true rigor mortis when it was merely a stiffness due to something else.” The witness stated his mistake involved a matter of interpretation of a finding which was subject to differences of opinion; that he did not believe the particular time of death could have been determined with any kind of an examination and it was still his opinion that death had occurred anywhere from forty-eight hours to two weeks prior to March 12th. A careful reading of Dr. Rogers’ testimony discloses nothing inconsistent with or contrary to a finding that death occurred on March 2d.
 

 Some attempt is made to discredit the findings of the crime laboratory because the Polcen gun was apparently tested around the end of March, 1955, and returned as having-nothing to do with the crime, a situation also involving the failure of the technician to fill out or retain certain work sheets. Since a thorough re-examination was subsequently made and the findings based thereon showed conclusively that the Polcen gun had fired the two blue shells, the facts relied upon by appellants are entirely immaterial. Appellants were not prejudiced because a complete file on the first test was missing. The jury had the benefit of all the laboratory’s findings on the second examination.
 

 Appellants maintain that Modquin’s testimony is wholly incredible and unworthy of belief. Modquin admitted his only meal on the day in question was breakfast; that he spent much of the remainder of the day drinking; and that he suffered a hang-over the next morning. It would serve no purpose to detail his testimony in that respect, since there is nothing in the evidence to prove that his state of drunkenness was such as would have rendered him incapable of recalling the events to which he testified. His credibility and the weight of his testimony were for the jury.
 

 The appellant Solomon Peter John testified on the trial, denying he had any part in the crime. He testified he spent
 
 *12
 
 March 2, 1955, at his home until about 8 o’clock in the evening when he went to the National bar; that he stayed there until closing; that he left the bar with Alvin Polcen and Modquin with a case of beer and a bottle of whiskey and they went to Lemire’s home where they found the Lemires had retired; that Polcen and Modquin left after about ten minutes and that he, John, stayed there all night. While he denied taking a trip with Polcen and Modquin to the vicinity of the Crass cabin, his description of their activities later that night corroborated that part of Modquin’s testimony. There is no merit in appellants’ argument that where John’s testimony contradicts that of Modquin, it is John who should be believed. The jury was not bound to believe one witness rather than another; its function was to resolve the discrepancies in the testimony and the conflicts in the evidence and to accept such parts of the contradictory evidence as it believed.
 
 State v. Schweider
 
 (1959), 5 Wis. (2d) 627, 94 N. W. (2d) 154.
 

 Some point is made in appellants’ argument of an affidavit by Modquin presented to the court after verdict, at the time the motion for a new trial was made. In the affidavit Modquin stated that he really did not know if the trip past the Rod and Gun Club to the vicinity of Crass’ cabin was made in February, March, or April of 1955, but that he was coerced into saying it was made on March 2, 1955. The only part of his testimony which would be placed in doubt by that statement was the date on which the events occurred. As pointed out above, John testified it was on March 2, 1955, that he was drinking with Polcen and Modquin in the National bar, after which they bought the beer and the whiskey and went to Lemires, and in these respects his testimony is the same as Modquin’s. Even if Modquin had testified he was uncertain as to the date, his testimony was such that, if the jury chose to believe it, and considering it along with all
 
 *13
 
 the other evidence in the case, was sufficient to sustain the convictions.
 

 The verdict is not contrary to the established physical facts nor to all the reasonable probabilities.
 

 Appellants call attention to the fact that after the trial, which lasted seven days, the jury deliberated only sixty-seven minutes before bringing in its verdict. It is argued that this shows the jury did not fully and fairly consider all the evidence. It could as well be argued that the evidence which the jury believed was considered by it as so convincing that the verdict could be reached after a comparatively short time. While it serves no purpose to speculate as to what the deliberations of the jury were, it may be observed generally that there was no substantial conflict in the evidence. The process of arriving at a verdict depended largely on agreement as to the credibility of the witnesses and this is a matter upon which the individual jurors may well have reached a unanimous view by the time all the evidence was in.
 

 Appellants argue that the trial court failed to instruct the jury that an admission of one of two coconspirators made after the act is not evidence against the other and that such omission constitutes reversible error. This argument refers to the testimony of Modquin that in the summer of 1955, John answered “Yes” to his question “if he killed that man.” The record shows that appellants made no request for the instruction. Under such circumstances no error was committed. In
 
 Birmingham v. State
 
 (1911), 145 Wis. 90, 91, 129 N. W. 670, this court said:
 

 “Complaint is made of the charge to the jury. The alleged error consists of an act of omission rather than one of commission. Little fault is found with what the court said and little fault could be found with it, because, to say the least, as far as it went it was beyond criticism. But it is urged that the charge was not complete in that the court failed to instruct the jury fully on certain matters. No instructions
 
 *14
 
 were asked by the defendant and hence no error was committed. [Citing cases.]”
 

 Nor was this alleged error specified in appellants’ motion for a new trial.
 

 One of the grounds stated in the
 
 motion
 
 was that of newly discovered evidence. This is a matter which rests largely in the discretion of the trial court and its decision will not be disturbed on appeal in the absence of a dear abuse of discretion.
 
 State v. Driscoll
 
 (1953), 263 Wis. 230, 56 N. W. (2d) 788. The evidence referred to is the affidavit of Modquin to the effect that he was improperly induced to say that the trip past the Rod and Gun Club was made on March 2, 1955. The record shows that the question of whether he had been coerced to testify as he did was thoroughly explored on cross-examination. It also shows that Modquin was vigorously cross-examined as to several statements he had made before the trial inconsistent with his testimony. The so-called newly discovered evidence would be merely cumulative of matters already presented to the court and the jury. Since there is nothing in it so conclusive and convincing that a new trial would probably result in a different verdict, we see no abuse of discretion on the part of the trial court and its decision will not be disturbed.
 

 By the Court.
 
 — Order affirmed.