RUIZ, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–353–CR. Submitted on briefs November 5, 1976.— Decided January 18, 1977.*
(Also reported in 249 N. W. 2d 277.)

---

[3] While appeal is taken from the merits of the underlying judgment, the merits are not argued by either party.

For the plaintiff in error the cause was submitted on the briefs of *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, *Charles R. Larsen* and *James H. McDermott,* assistant attorneys general.

HEFFERNAN, J.   After a jury trial, Frank J. Ruiz was convicted on October 31, 1974, of the first degree murder of Frank Cisneroz at the Casa Alegre tavern in Mount Pleasant, Racine county, on September 10, 1973. On this review it is alleged that the testimony of the state's principal witness, Thomas Garcia, was so inconsistent as to be inherently incredible, that at the time of the incident he was intoxicated to the degree that his observation was unreliable, and that, hence, the evidence was insufficient to prove the guilt of Ruiz beyond a reasonable doubt.

It is also claimed that Ruiz was denied due process because, it is alleged, the prosecutor failed to disclose to the defense a promise made to Garcia in exchange for his testimony.

We conclude that none of these asserted grounds warrant a reversal of the conviction.

■ ■ Even though there be glaring discrepancies in the testimony of a witness at trial, or between his trial testimony and his previous statements, that fact in itself does not result in concluding as a matter of law that the witness is wholly incredible. Rather, the question is whether the factfinder believes one version rather than another or chooses to disbelieve the witness altogether. Only a question of credibility, which in the instant case was resolved in favor of believing the testimony proving guilt, is raised. That question was one for the jury.

It is asserted that Garcia, who was the key witness for the state, feared to testify against Ruiz, because he, Garcia, had a burglary charge pending against him in Kenosha county, and he believed that, if his testimony resulted in the incarceration of Ruiz at Waupun and he, Garcia, were committed to the same prison for the burglary, he would be killed by Ruiz or Ruiz's friends at the prison. It is asserted by the defendant that, to induce Garcia to testify against Ruiz, the district attorney of Racine county used his influence with the district attorney of Kenosha county to secure Garcia the assurance that he would not be sent to the Wisconsin State Prison with Ruiz in the event he was found guilty of the burglary.

It is clear that some effort was made by the Racine county district attorney to assure Garcia that the Kenosha county district attorney would not "push for incarceration" and that, if he were incarcerated, he would be segregated from Ruiz and the friends of Ruiz, who might do him harm.

■ This arrangement was not known to the defendant until after trial, and he claims that he was denied a due

process trial because the revelation to the jury of the arrangement between Garcia and the prosecutor would have furnished grounds for an attack on the credibility of Garcia, who was indeed the state's key witness. We conclude, however, that, in the absence of any demand or request for discovery prior to or during trial, and because the information—even were it produced—would be neither exculpatory nor material in the sense that the production of the evidence would raise a reasonable doubt where none existed before, there was no denial of due process.

In respect to the defendant's first contention—that the testimony of Garcia was inherently incredible—it is clear that Garcia's testimony was crucial. Only he testified to seeing Ruiz stab Cisneroz. There was a minor discrepancy between the testimony of Garcia at the preliminary examination and at trial. At the preliminary, Garcia, who was at the other end of the bar from Ruiz and his victim, stated that he had not been observing the patrons at the other end of the bar and only turned around when he heard the breaking of bottles, and it was then he saw Ruiz strike Cisneroz with a knife. At trial Garcia said he had been watching, and he saw the defendant stab Cisneroz before he fell against the bar and broke the bottles. In other respects the testimony at the preliminary and at the trial was substantially the same. Garcia did not equivocate in respect to the facts of the stabbing. He never claimed to have seen a fight.

Discrepancy between the sequence of events recited at the preliminary and the sequence related at trial does not constitute a repudiation of the prior testimony, nor does it impel the conclusion that none of the testimony was believable. It was to a very significant degree consistent. As the trial judge stated, "Clearly his testimony then at the prelim was that he observed the stabbing and [in] substantially the manner in which he testified to on trial."

It is argued that all witnesses other than Garcia testified that a fight preceded the stabbing of Cisneroz; and, hence, Garcia's testimony was incredible as being contrary to all other testimony. That legal position was repudiated in *Banks v. State,* 51 Wis.2d 145, 153, 186 N.W.2d 250 (1971), wherein we said:

". . . that he did not shoot . . . is not corroborated by any of the other . . . witnesses. However, the mere fact of numbers is not in and of itself sufficient to render the testimony of a witness inherently incredible."

The jury, as the judge of credibility, had the right to believe the testimony of Garcia and to disbelieve the unanimous testimony of witnesses to the contrary. *Sykes v. State,* 69 Wis.2d 616, 230 N.W.2d 760 (1975); *State v. Zdiarstek,* 53 Wis.2d 776, 193 N.W.2d 833 (1972); *Embry v. State,* 46 Wis.2d 151, 174 N.W.2d 521 (1970); *Peters v. State,* 70 Wis.2d 22, 233 N.W.2d 420 (1975).

There was testimony that Garcia had drunk a number of beers shortly before the stabbing. It is alleged that, because of such drinking, he was intoxicated to the extent that his testimony was incredible as a matter of law. It should be noted at the outset that the State Public Defender cites nothing from the record to prove the degree of Garcia's intoxication. He merely asserts that Garcia admitted to having drunk "quite a few beers," and that "every witness . . . was . . . under the influence." Clearly the state of a witness' sobriety at the time he makes an observation is relevant, and a jury can ignore the testimony of one it believes to have been so intoxicated as to be unreliable, but intoxication *per se* does not render the testimony of a witness incredible as a matter of law. *State v. John,* 11 Wis.2d 1, 103 N.W.2d 304 (1960).

As was said in *State v. Powers,* 66 Wis.2d 84, 224 N.W. 2d 206 (1974), where it was asserted that the testimony of one of the witnesses was incredible as a matter of law:

"The mere fact that Mr. Callahan testified he was not intoxicated and other witnesses testified that he was intoxicated was merely another factor to be weighed in determining the credibility of his testimony, but the effect to be given to that conflict in the testimony as to Mr. Callahan's state of sobriety and the extent to which it may have affected his testimony if he was intoxicated was a matter for the jury." (at 93)

It is only where "no finder of fact could believe the testimony" (*State v. Powers, supra,* at 93) that we would be impelled to conclude that it was incredible as a matter of law.

Drunk or not, Garcia was believed by the jury, and we cannot conclude that there was such evidence of intoxication that it was irresponsible for the jury to give credence to his testimony.

The testimony of Garcia could have been disbelieved by the jury, but it was not. If believed, as it was, it supplied evidence that was sufficient to sustain the conviction of Ruiz for first degree murder.

Ruiz also claims he was denied due process because the prosecutor withheld from him the information that Garcia was given assurance that he would not be likely to go to Waupun for an unrelated crime if he testified against Ruiz. This information might have been useful in undermining the credibility of Garcia, for it would have shown a motive to testify falsely against Ruiz to gain an advantage for himself.

In the instant case no demand for the discovery of specific or of general information in the prosecutor's files that might prove useful to the defense was ever made. There is authority, however, that holds that, in some circumstances, a prosecutor *sua sponte* has the obligation of revealing information to the defense if, in the absence of such information, there could not be a fair trial.

American Bar Association Standards, *Discovery and Procedure Before Trial,* sec. 2.1(c), provides that:

". . . the prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

It is apparent that the information in respect to any assurances given Garcia which might have assuaged his fears of testifying have not even a peripheral relation to the guilt of Ruiz or the punishment which he might warrant. It does not appear that the American Bar Association Standards require a *sua sponte* disclosure of the type of arrangement between the witness Garcia and the two prosecutors.

*Brady v. Maryland,* 373 U.S. 83 (1963), involved the possession of a confession to the effect that one other than the accused committed the crime. In that case the United States Supreme Court said:

". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (at 87)

The *Brady* court, relying on *Mooney v. Holohan,* 294 U.S. 103 (1935), and *Pyle v. Kansas,* 317 U.S. 213 (1942), emphasized that the societal value sought to be preserved by compelling prosecutorial disclosure was the right to a fair trial.

The *Brady* principle was extended in *Giglio v. United States,* 405 U.S. 150 (1972), to the disclosure of evidence which was material to the credibility of a key witness. In *Giglio,* unlike the instant case, a demand for disclosure had been made. Moreover, the court strictly limited the remedy of new trial to situations where a motive was revealed for the witness to lie and where the falsehood had a reasonable likelihood of affecting the jury's judgment. The court said:

"We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' *United States v. Keogh,* 391 F.2d 138, 148 (CA 2 1968)."

Applying that principle to this case, it is indeed conceivable, on the basis of revealing to the jury the assurances given to Garcia, that he could testify with safety, that a skilled defense counsel could have undermined Garcia's testimony, but we cannot conclude that such attacks on the credibility of Garcia were "likely to have changed the verdict." *United States v. Keogh, supra,* at 148.

*United States v. Keogh, supra,* which was relied upon in *Giglio,* distinguished situations in which clearly material and exculpatory evidence was deliberately withheld after a demand was made from situations where the suppression was not deliberate and only hindsight could disclose the use to which the material could be put by the defense. Judge Friendly, writing for the court, said:

"Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different. Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to require a substantially higher probability that disclosure of the evidence to the defense would have altered the result. To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties." (at 148)

It would appear that, in any case where the material is not on its face exculpatory or relevant to punishment, a demand must be made for production of the material.

*Nelson v. State,* 59 Wis.2d 474, 208 N.W.2d 410 (1973), adopted the rule of *Brady,* and found that there had been a broad *Brady* type request for information that triggered the duty of the prosecutor to produce evidence that a person other than the accused had confessed to the crime. It found no error, however, because the evidence, if produced, would not have been likely to change the verdict. The charge was attempted first degree murder, and the evidence was overwhelming that the accused had fired some of the shots, even though the withheld confession was highly probative that another had fired the fatal shot.

It should be stressed, moreover, that in the instant case there is nothing to indicate that Garcia perjured himself. It appears clear from the record that the threats which caused Garcia's fears came after his testimony at the preliminary examination, and it was only after the preliminary that Garcia and the district attorney entered into an agreement to attempt to protect Garcia from reprisals for his trial testimony. But as the trial judge pointed out, the "post-deal" testimony at trial was consistent with the testimony at the preliminary. There is no evidence that the agreement to protect Garcia resulted in perjured testimony. True, the knowledge of the agreement might have made it possible for a skilled counsel to convey to the jury that the agreement resulted in testimony more favorable to the prosecution than it would otherwise have been. But the additional evidence—evidence of the agreement to protect the witness against reprisals—was irrelevant to Ruiz's guilt or innocence.

What the Public Defender asserts is the "sporting theory of justice," which was expressly rejected in *Brady, supra,* at 90, and in *United States v. Agurs,* 427 U.S. 97, 49 L. Ed.2d 342, 96 S. Ct. 2392 (1976). As the court said in *Agurs:*

"The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose

any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in *Brady*. For a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice." (Slip Opinion at 11, 49 L. Ed.2d at 352–53)

Here it seems clear that the most defense counsel could have accomplished was a muddying of Garcia's motives in testifying, but no evidence would have come in thereby "giving rise to a legitimate doubt on the issue of guilt."

Cases prior to *Agurs* left unresolved the question whether, in the absence of a demand for disclosure, the right to assert the denial of due process for lack of disclosure was waived. The American Bar Association Standards, *Discovery and Procedure Before Trial*, sec. 2.1 (c), *supra,* seem to indicate that, at least under some circumstances, a duty was placed upon the prosecutor to make disclosures to the defense *sua sponte*. The teaching of the cases prior to *Agurs* was apparently otherwise.

The Public Defender in his principal brief predicted correctly that *Agurs,* then on appeal from the Court of Appeals for the District of Columbia, 510 F.2d 1249, would require the United States Supreme Court to deal with the question of whether a demand was necessary. While the Supreme Court addressed itself to the problem of when a demand to disclose is necessary, its resolution of the question is less than clear.

The Supreme Court in *Agurs* pointed out that, where the prosecutor has in his possession material that is exculpatory, i.e.:

". . . is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce,

that duty should equally arise even if no request is made." (Slip Opinion at 9, 49 L. Ed.2d at 351)

Elsewhere in the opinion, the court stated:

". . . there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." (*Agurs,* Slip Opinion at 13, 49 L. Ed.2d at 353–54)

Hence, it appears that, in respect to truly exculpatory evidence, there is a duty which requires a prosecutor to produce the evidence *sua sponte.* Such duty, however, will also be triggered by a broad or general request "for 'all *Brady* material'" or for "'anything exculpatory.'" (*Agurs,* Slip Opinion at 9, 49 L. Ed.2d at 351)

The Supreme Court also pointed out that the prosecutor had a duty to produce specific material matters on demand. The court said:

"In *Brady* the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." (*Agurs,* Slip Opinion at 9, 49 L. Ed.2d at 351)

It would appear that in the instant case the evidence of the agreement now sought was not exculpatory in any sense of the word and the disclosure of the omitted evidence would not have created a reasonable doubt of the guilt of Ruiz that did not before exist. It is apparent, therefore, that this was not the type of evidence which the prosecutor, *sua sponte,* was obliged to disclose. Hence, in this case there was in effect a waiver of the right of

disclosure by failure to make a specific request. Even a general request for all *"Brady* materials" or "anything of an exculpatory nature" would have been insufficient, for the information did not have constitutional materiality in the due-process sense required by *Brady* and its progeny.

It is apparent, however, that this is a "hen or the egg" situation, for in effect the United States Supreme Court has said the prosecutor has a *sua sponte* duty to disclose all material matters that are exculpatory or raise a reasonable doubt in respect to guilt, but that a demand must be made for a material matter that does not rise to such status that "elementary fairness requires it to be disclosed even without a specific request." *Agurs*, Slip Opinion at 13, 49 L. Ed.2d at 354. However, according to *Agurs*, it appears in no event will the failure to disclose, whether on demand or not, result in a new trial unless, in light of the entire record, the omitted evidence creates a reasonable doubt that did not otherwise exist. This test for error is all but synonymous with the duty to disclose *sua sponte*. It would appear, therefore, that the United States Supreme Court has established a reversal standard that has nothing to do with a demand for disclosure. Rather, it seems that highly exculpatory matters must be disclosed with or without demand, and such matters defined as "material" are of the type that would create a reasonable doubt as to guilt. Hence, the failure to disclose, *sua sponte* or otherwise, "evidence [which] is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed" (*Agurs*, Slip Opinion at 13, 49 L. Ed.2d at 354) will result in a new trial unless the *judge* concludes that the presence of the omitted evidence would not create a reasonable doubt of guilt.

It appears, therefore, that, under the standard of *Agurs*, unless the evidence not disclosed is probative of

innocence, no duty to disclose arises, and only if the evidence not disclosed would have created a reasonable doubt was constitutional error committed by the non-disclosure.

This is a tail-chasing proposition, for *Agurs* only makes clear the obvious—that a disclosure of highly exculpatory evidence is a *sua sponte* obligation of a prosecutor and that the suppression of such highly exculpatory evidence is constitutional error.[1]

It would appear that the nondisclosed matter, if disclosed, would have given the defendant a better "sporting chance" to undermine the credibility of Garcia, but the nondisclosure does not rise to constitutional proportions under the majority's rationale in *Agurs*.[2]

Such is the case here. The timely receipt of the information that the prosecution and Garcia had made a

[1] "Logically the same standard must apply at both times. For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.

". . . But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." (*Agurs*, Slip Opinion at 10–11, 49 L. Ed.2d at 352)

[2] The minority of the Court saw the potential utility of the nondisclosed evidence in a different light—and reasoned in terms of a "significant," rather than a "sporting," chance:

"This case, however, does not involve deliberate prosecutorial misconduct. Leaving open the question whether a different rule might appropriately be applied in cases involving deliberate misconduct, I would hold that the defendant in this case had the burden of demonstrating that there is a *significant chance* that the withheld evidence, developed by skilled counsel, would have induced a reasonable doubt in the minds of enough jurors to avoid a conviction. This is essentially the standard applied by the Court of Appeals, and I would affirm its judgment." (Emphasis supplied.) (*Agurs* dissent, Slip Opinion at 8–9, 49 L. Ed.2d at 360)

deal might well have swayed a jury to give less credence to Garcia's testimony. The defendant's "sporting chance" of success to a degree—not measurable—might have been increased, but even a full belief that an arrangement had been made for the protection of the witness Garcia does not impel any greater likelihood of finding that Ruiz was not guilty. It is irrelevant to it, and it is clear that the consistent inculpatory evidence at the preliminary and at the trial was not perjured.

In the instant case, there was no constitutional requirement that the prosecutor *sua sponte* disclose the agreement with the witness Garcia. Since no demand was made for the information, we do not decide the consequences of a nondisclosure in face of a demand. We emphasize we deal only with disclosures that may be mandated by the due process clause of the Fourteenth Amendment, and in no way by this opinion expand or limit discovery rights under rules of practice and procedure.[3]

*By the Court.*—Judgment and orders affirmed.

---

[3] Nor do we go here to the separate question of the use of perjured testimony that was or should have been known. It is quite clear that in those cases a new trial is required if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. See *Agurs,* Slip Opinion at 7, 49 L. Ed.2d at 350.