State of Wisconsin, Plaintiff-Respondent,
v.
Andre E. Dixon, Defendant-Appellant.
Nos. 03-0946-CR, 03-0947-CR
Court of Appeals of Wisconsin.
Dated and Filed: February 17, 2004.
Before Wedemeyer, P.J., Fine and Curley, JJ.
¶1. PER CURIAM.
Andre E. Dixon appeals from a judgment, entered after a jury trial, convicting him of operating a vehicle without the owner's consent, by threat and use of force, in violation of Wis. Stat. § 943.23(1g) (2001-02),[1] and operating a vehicle without the owner's consent, by threat and use of force and causing great bodily harm, in violation of § 943.23(1m). He also appeals from an order denying his motion for postconviction relief. Dixon contends that: (1) the circuit court erred when it consolidated two of his cases for trial; (2) there was insufficient evidence to convict him of the crimes; (3) the verdicts are inconsistent; (4) the trial court erroneously exercised its discretion when it imposed a seventy-year sentence; and (5) the trial court should have ordered a new trial in the interest of justice. Because the two cases were properly joined, there was sufficient evidence to support the verdicts, inconsistent verdicts do not warrant reversal, the trial court properly exercised its sentencing discretion, and Dixon has failed to establish that a new trial is warranted, we affirm.

I. Background.
¶2. On May 25, 2001, four young men in a Ford Mustang stopped to talk to several teenage girls walking down the street. While they were talking, two other young men, Dixon and Cornell Reynolds, approached the car. Reynolds approached the driver's door, and there is some question as to exactly where Dixon was standing. Although the witnesses' testimonies varied, they all placed Dixon somewhere near the car, whether it was near the trunk or closer to the door. Reynolds asked the group whether anyone had any marijuana, and they all responded in the negative. Reynolds then removed a gun from his pants, stated that this was a robbery, and fired two shots at one of the victims.
¶3. Two of the young men got out of the car and ran, while more shots were being fired in the vicinity of the Mustang. One of the young men testified that he turned around and saw Reynolds shooting at the victim, who later died, and saw the victim fall to the ground. He also testified that he saw Dixon and Reynolds get in the car and drive away. The three teenage girls related similar accounts at trial, except for their testimony regarding how many people were in the car when it drove away.
¶4. Nearby on that same evening, four young men in a Ford Explorer went to pick up two friends. When they arrived, the two were not ready to go, so the four young men left and came back fifteen minutes later. One of the two then came out of the house and waited in the car with the others. As they waited, the driver noticed two young men walking down the sidewalk. He heard a noise that sounded like firecrackers, and then heard screeching tires. A few moments later, the two young men walking down the street approached the passenger side of the car, one pointed a gun in one of the passenger's face, and ordered him out of the car. All five exited, and the two young men drove away in the car. The driver described the young man with the gun, who was later identified in a photo array by one of the passengers, as Dixon.
¶5. A .380 bullet casing was recovered from the scene of the latter incident. Three .380 bullet casings were recovered from the scene of the incident involving the Mustang. There were also bullets removed from the two victims. A firearm examiner testified that the casings found at both scenes were fired from the same gun. He also testified that the bullets removed from the two victims were fired from the same gun.
¶6. Four months later, in September 2001, Dixon was arrested and charged with felony murder, party to a crime, and operating a vehicle without the consent of the owner, by threat and use of force and causing great bodily harm, party to a crime. These charges all resulted from the incident involving the Mustang. He entered a plea of not guilty, and the matter was set for trial.
¶7. In January 2002, the State filed a motion to introduce" other acts" evidence regarding the incident involving the Explorer. See Wis. Stat. § 904.04(2). The motion was denied. The State then sought and obtained an adjournment, in order to charge Dixon with a separate crime based upon the "other acts" evidence it sought to introduce.
¶8. In February 2002, Dixon was charged with one count of operating a vehicle without the consent of the owner, by threat and use of force, party to a crime. This charge was a result of the incident involving the Explorer.
¶9. Shortly thereafter, the trial court granted the State's motion to consolidate the two cases. The consolidated cases were eventually tried to a jury.
¶10. Dixon testified that he was waiting at a bus stop when a car pulled up next to him. He said that one of the men who got out of the car asked him if he needed a ride. He recognized this man as an acquaintance, and eventually said yes. The acquaintance told the other man who got out of the car (Reynolds), a man whom Dixon claimed he did not know, to give Dixon a ride home. Dixon testified that while he and Reynolds were walking through a parking lot, Reynolds started speaking with the young men in the Mustang. Dixon testified that Reynolds then started shooting, and Dixon ran to call his brother to come pick him up. His brother testified that he picked up Dixon after the shooting.
¶11. Dixon also testified that he did not know that a crime was going to be committed and that he never did or said anything during the incident. He explained that when he heard gunshots, he ran down the street. He further testified that he had nothing to do with the incident regarding the Explorer.
¶12. Dixon was acquitted of the felony murder charge, but found guilty of the other two charges. He was sentenced to a total of seventy years: twenty years of initial confinement and twenty years of extended supervision on one count, and fifteen years of initial confinement and fifteen years of extended supervision on the other, to be served consecutively. Dixon filed a postconviction motion, which was denied, and this court consolidated the two cases for appeal.

II. Analysis.

A. The two cases were properly joined.
¶13. Dixon contends that it was "inconsistent" for the trial court to deny the State's motion seeking to introduce" other acts" evidence because it was unfairly prejudicial and then allow the State to adjourn the matter, charge Dixon with a separate crime based upon the "other acts" evidence, and consolidate the cases for trial. He insists that "[s]uch a decision by the court is inconsistent as it allows the State to do indirectly what the Court did not allow it to do directly." Dixon argues that consolidation was not necessary, as "the crimes were not all that similar to favor consolidation[.]" We disagree.
¶14. Wisconsin Stat. § 971.12(1) allows for the joinder of crimes and provides, in relevant part:
Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.
"Whether the ... joinder was proper is a question of law that we review without deference to the trial court, and the joinder statute is to be construed broadly in favor of ... joinder." State v. Locke, 177 Wis. 2d 590, 596, 502 N.W.2d 891 (Ct. App. 1993). We have noted that our supreme court has concluded that "where crimes charged involved two or more incidents which exhibited the same modus operandi, were close in time, and occurred within the same geographic area, the acts were connected or constituted parts of a common scheme or plan which tended to establish the identity of the perpetrator." State v. Hamm, 146 Wis. 2d 130, 139, 430 N.W.2d 584 (Ct. App. 1988) (emphasis added) (citing Francis v. State, 86 Wis. 2d 554, 560-61, 273 N.W.2d 310 (1979)). In determining that there was a "connection" between incidents, the supreme court has been satisfied when "the incidents had common factors in that they were closely related in terms of time, place and modus operandi, scheme or plan." State v. Hall, 103 Wis. 2d 125, 139, 307 N.W.2d 289 (1981) (footnote omitted).
¶15. "On the granting of a motion to consolidate, reversal requires a finding of [an erroneous exercise] of discretion, exactly as would be the test on denial of a motion for severance." Holmes v. State, 63 Wis. 2d 389, 396, 217 N.W.2d 657 (1974) (footnote omitted). When a defendant moves to sever, "the trial court must determine what, if any, prejudice would result from a trial on the joined offenses[, and] weigh [that] potential prejudice against the interests of the public in conducting a trial on the multiple counts." Locke, 177 Wis. 2d at 597. In order to establish that the trial court erroneously exercised its discretion, the defendant must establish that he or she suffered "substantial prejudice." See id. Yet, "[i]f the offenses meet the criteria for joinder, it is presumed that the defendant will suffer no prejudice from a joint trial." State v. Leach, 124 Wis. 2d 648, 669, 370 N.W.2d 240 (1985). That is, however, a rebuttable presumption. Id.
¶16. Thus, it is first necessary to determine whether the joinder was proper. Dixon contends that the witnesses were not common, the "co-actors in the crimes were not the same," and the crimes "were not all that similar to favor consolidation." He insists that the "only similarity" was the type of crime. We disagree. The incidents met all the requirements. The crimes exhibited the same modus operandi, were close in time, and occurred within the same geographic region. Moreover, there was evidence indicating that the bullet casings recovered from both scenes were fired from the same weapon. Accordingly, joinder was proper.
¶17. Next, it is necessary to determine whether the trial court erroneously exercised its discretion in granting the State's motion to consolidate. Here, after hearing argument from both Dixon and the State, the trial court held:
Given the commonality of the two cases, the two incidents, given the limited time and time frame in which they occurred  essentially we are talking about an hour and a half  given the proximity we are talking about regarding location  and I want to say it is within a mile, at least within two miles of each other  given all of those factors, this Court finds that joinder is appropriate, and the Court will grant the motion [for] joinder with respect to these two cases.
The trial court further indicated:
If it becomes apparent that there is somehow some prejudice that obviously results as a result of this Court ordering joinder, then, [defense counsel], you can at that point move the Court for severance. That is something that I will have to deal with, if, in fact, it becomes apparent the prejudice is to[o] great.
Despite the trial court's suggestion, it does not appear that Dixon ever moved for severance. At the hearing, he argued that he would be prejudiced by joining the two cases, that he may only want to testify as to one incident and not the other, and that "there is no judicial economy with regard to trying them together." The trial court addressed the selective testimony issue, whether joinder would be appropriate under Wis. Stat. § 971.12(1), and the "other acts" evidence issue. The trial court indicated that it would instruct the jury that it would have to make a determination on each crime separately, and concluded that "there are many safeguards to ensure that this defendant is treated fairly and that the potential prejudice or confusion that will relate from these two incidents is being addressed."
¶18. The trial court was not satisfied with Dixon's showing of alleged prejudice, but offered to reconsider the joinder if it ever "bec[a]me apparent [that] the prejudice is to[o] great." Dixon did not avail himself of that opportunity. The offenses met the proper criteria for joinder, and it is accordingly presumed that he would suffer no prejudice as a result of the charges being joined for trial. See Leach, 124 Wis. 2d at 669. Dixon has failed to establish that he suffered substantial prejudice as a result of the joinder. As such, we cannot conclude that the trial court erroneously exercised its discretion in joining the cases for trial.

B. There was sufficient evidence to support the convictions.
¶19. Dixon insists that the State did not prove the two counts of operating a vehicle without the owner's consent beyond a reasonable doubt. In regard to the Explorer incident, he contends that the testimony of the only witness to identify him was inconsistent with the other witnesses, and that "it was virtually impossible for [the witness] to make the identification that he did[.]" He further argues that none of the witnesses' stories corroborated one another and that one of the responding police officers even "doubted the story and what actually happened." Regarding the Mustang incident, Dixon contends that there was no evidence indicating that he was an active participant in the crime. He insists that the witnesses only testified that he was present at the scene, and that "mere presence" is not sufficient to support a conviction as a party to a crime. Dixon argues that "[t]here was a reasonable hypothesis of innocence and the jury ignored it." We conclude that there was sufficient evidence to support the convictions.
¶20. As the supreme court reiterated in State v. Poellinger, 153 Wis. 2d 493, 503-04, 451 N.W.2d 752 (1990) (citations omitted) (alterations and omissions in original):
The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true.... The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted.
¶21. An appellate court gives deference to a trial court's findings because of "the superior opportunity of the trial court to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony." Kleinstick v. Daleiden, 71 Wis. 2d 432, 442, 238 N.W.2d 714 (1976). It is the jury's job to resolve any conflicts or inconsistencies in the evidence and to judge the credibility of the evidence, State v. Pankow, 144 Wis. 2d 23, 30-31, 422 N.W.2d 913 (Ct. App. 1988) ("The function of the jury is to decide which evidence is credible and which is not, and how conflicts in the evidence are to be resolved."), and "[i]t is certainly allowable for the jury to believe some of the testimony of one witness and some of the testimony of another witness even though their testimony, read as a whole, may be inconsistent." State v. Toy, 125 Wis. 2d 216, 222, 371 N.W.2d 386 (Ct. App. 1985). Further, "[t]he jury, as the judge of credibility, ha[s] the right to believe the testimony of [one witness] and to disbelieve the unanimous testimony of witnesses to the contrary." Ruiz v. State, 75 Wis. 2d 230, 234, 249 N.W.2d 277 (1977). Moreover, "[o]nly when the evidence is inherently or patently incredible will [the court] substitute [its] judgment for that of the factfinder." State v. Saunders, 196 Wis. 2d 45, 54, 538 N.W.2d 546 (Ct. App. 1995) (citation omitted).
¶22. Without any citations to the record, Dixon contends that there were several inconsistencies in the witnesses' testimonies, and claims that there was insufficient evidence to support the verdicts. After reviewing the record, it becomes clear that while there were inconsistencies, Dixon's claims that none of the witnesses corroborated each other in the Explorer case and that there was no evidence that he was an active participant in the Mustang case are misleading.
¶23. Regarding the Explorer case, Dixon claims that it was "virtually impossible" for the witness "to make the identification that he did in this case." Why he claims that to be so is unclear. While he argues that the witness's testimony is "extremely inconsistent," he fails to indicate exactly how it was "virtually impossible" for the witness to identify Dixon. He does note that the witness "said that he could see through the seat back," which would seem to be an unlikely ability, but the State correctly notes that the witness testified that he could see "over the seats." Regardless, the witness testified as to where Dixon was standing during the incident, why he was able to see his face, and that he was able to identify Dixon in a photo array five days after the incident. The alleged inconsistencies do not appear to render the witness's testimony regarding the incident inherently or patently incredible.
¶24. Furthermore, the record refutes Dixon's claim that" none of the witnesses corroborated each other." For example, two other witnesses gave descriptions of the gunman that matched that of Dixon. And although Dixon appears to insist that the identifying witness "said that he [the witness] was already in the truck but no one else said he was in yet," the transcripts indicate that two other witnesses placed the identifying witness in the truck.
¶25. In regard to the Mustang case, Dixon claims that none of the witnesses testified that he said or did anything during the incident. He insists that his mere presence was not enough to convict him as a party to the crime. He further contends that his testimony-that he left the scene and did not get into the Mustang-was corroborated by another witness. What Dixon fails to mention, however, is that three other witnesses testified that he was in the car as it drove away, and that one witness testified that he was looking around in "every direction" during the incident. While more than one reasonable inference can be drawn from the testimony that Dixon was looking around in "every direction," one such reasonable inference is that he was acting as a "look out."
¶26. Dixon makes much of the inconsistent testimony presented at trial. It is the job of the jury, however, to weigh any inconsistencies in the evidence and the credibility of the witnesses, and the jury has every right to believe some of one witness's testimony and some of another, even though they may be inconsistent. Dixon has failed to establish that any of the evidence was patently or inherently incredible. Viewed in a light most favorable to the verdict, the record belies Dixon's claim that there was insufficient evidence to support the convictions.

C. The inconsistent verdicts do not warrant reversal.
¶27. Although Dixon acknowledges that the law regarding the consistency of verdicts is well established, he insists that "the verdict in this case was so repugnant so as to warrant this [c]ourt to overturn the verdict and order a new trial on the second count[.]" He contends that "[ t]he verdicts negate each other in that the jury found that [he] was not involved in the crime but yet he must have been involved in it." As Dixon has noted, the law is well established, and we conclude that the inconsistent verdicts do not warrant reversal.
¶28. In Dunn v. United States, 284 U.S. 390, 393 (1932), the United States Supreme Court held: "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." Later, in State v. Mills, 62 Wis. 2d 186, 191, 214 N.W.2d 456 (1974), our supreme court stated:
It has been universally held that logical consistency in the verdict as between the several counts in a criminal information is not required. The verdict will be upheld despite the fact that the counts of which the defendant was convicted cannot be logically reconciled with the counts of which the defendant was acquitted.

(Footnote omitted and emphasis added.) "[T]he right to be inconsistent in this respect is the jury's prerogative, not [the] court's." Nabbefeld v. State, 83 Wis. 2d 515, 529, 266 N.W.2d 292 (1978).
¶29. As it is well established that inconsistent verdicts in criminal cases will be upheld, despite the fact that they cannot be logically reconciled, and "[t]he supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case[,]" Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), we cannot conclude that the inconsistent verdicts warrant reversal.

D. The trial court properly exercised its sentencing discretion.
¶30. Dixon contends that the seventy-year sentence imposed was "extremely harsh given [his] culpability in the crimes as found by the jury in this case." He insists that a" non-shooter co-defendant sentence of seventy years is so disproportionate to [his] culpability ... that the sentence violates the judgment of reasonable people concurring [ sic] what is right and proper under the circumstances." He argues that the trial court ignored his personal characteristics and background, the inconsistencies in the evidence, and "all other relevant and mitigating factors presented";" blindly accepted all of the State's witnesses"; and placed undue weight on his criminal record and "contacts with the juvenile justice system" when imposing sentence.[2] He further contends that the trial court improperly considered the statements of the deceased victim's mother, since the jury "specifically found [him] not guilty of the crime regarding her son." We disagree.
¶31. Sentencing is well within the discretion of the trial court, State v. Larsen, 141 Wis. 2d 412, 426, 415 N.W.2d 535 (Ct. App. 1987), and "[t]he trial court has great latitude in passing sentence[,]" State v. J.E.B., 161 Wis. 2d 655, 662, 469 N.W.2d 192 ( Ct. App. 1991). Our review "is limited to determining whether there was an [erroneous exercise] of discretion." Larsen, 141 Wis. 2d at 426 (citation omitted). Further, there is a "strong public policy against interference with the sentencing discretion of the trial court and sentences are afforded the presumption that the trial court acted reasonably." State v. Harris, 119 Wis. 2d 612, 622, 350 N.W.2d 633 (1984). "An [erroneous exercise] of discretion will be found only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." Ocanas v. State, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).
¶32. The trial court is to consider three primary factors in passing sentence: (1) the gravity of the offense; (2) the defendant's character; and (3) the need for the protection of the public. Elias v. State, 93 Wis. 2d 278, 284, 286 N.W.2d 559 (1980). The trial court may also consider:
the vicious or aggravated nature of the crime; the past record of criminal offenses; any history of undesirable behavior patterns; the defendant's personality, character and social traits; the results of a presentence investigation; the degree of the defendant's culpability; the defendant's demeanor at trial; the defendant's age, educational background and employment record; the defendant's remorse, repentance and cooperativeness; the defendant's need for rehabilitative control; the right of the public; and the length of pretrial detention. State v. Borrell, 167 Wis. 2d 749, 773-74, 482 N.W.2d 883 (1992). The weight to be attributed to each factor "is a determination which appears to be particularly within the wide discretion of the sentencing judge." Ocanas, 70 Wis. 2d at 185.
¶33. In regard to Dixon's contention that the trial court improperly considered the statements of the deceased victim's mother, since he was acquitted of the crime involving her son, the State contends that this issue was waived when Dixon failed to object when the victim's mother spoke or when the court discussed the victim's death as it affected the sentence. Dixon contends that "[ n]othing could be further from the truth[,]" and "[t]he transcript will speak for itself as to [his] position on any objection to the death of [the victim] being considered by the [trial c]ourt." We can find nothing in the transcripts from the sentencing hearing indicating that Dixon made any objection to the comments.[3] Furthermore, in State v. Bobbitt, 178 Wis. 2d 11, 18-19, 503 N.W.2d 11 (Ct. App. 1993), this court concluded that the acts of violence surrounding the crime for which the defendant was convicted were relevant to the three primary sentencing factors. In that case, the defendant was charged with attempted homicide, armed robbery, and false imprisonment. Although he was acquitted on the attempted homicide charge, the trial court considered the violent acts surrounding the attempted homicide charge during sentencing. This court concluded:
The acts of violence surrounding the robbery which the trial court considered were relevant to important sentencing factors; namely, the gravity of the offense, the character of the defendant, and the need to protect the public. The consideration of the violent acts for sentencing purposes, even though Bobbitt was acquitted of the homicide charge, was not a denial of due process, particularly when the sentence imposed did not exceed the maximum available.
Id. (footnote omitted). As such, assuming the issue was preserved for appeal, the trial court properly considered the victim's death when it stated: "I take into account the loss of life with respect to [the victim], and I understand that although the jury has found you not guilty on the felony murder, the circumstances that relate to these car jackings [...] but for those events occurring you would not be here today."
¶34. A review of the sentencing transcript also renders the remainder of Dixon's claim unpersuasive. The trial court heard statements from the State, defense counsel, the deceased victim's mother, Dixon's mother, and Dixon's sister, and reviewed the presentence investigation report, the victim impact statement, letters filed with the court, a restitution worksheet, and a progress report from the jail. It considered the seriousness of the offenses noting the loss of life, the injuries, and the property damage that resulted from the incidents. It assessed Dixon's character and the danger to the community resulting from Dixon's apparent "nothing to lose" attitude and his willingness to "do anything even if it results in the loss of someone's life." The trial court expressed concern with the aggravated nature of the crimes, and Dixon's apparent unwillingness to follow the rules. Contrary to Dixon's contentions, the trial court did not ignore his background and personal characteristics or place undue weigh on his prior criminal record. Furthermore, Dixon was only sentenced to a combined thirty-five years of initial confinement, out of a possible maximum of eighty.
¶35. As the sentence was not "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people[,]" Ocanas, 70 Wis. 2d at 185, and Dixon has failed to identify any "unreasonable or unjustifiable basis in the record for the sentence complained of[,]" Elias, 93 Wis. 2d at 282, we conclude that the trial court properly exercised its sentencing discretion.

E. Dixon has failed to establish that a new trial is warranted in the interest of justice.
¶36. Dixon argues that "a review of the record reveals that justice was not accomplished at the trial[,]" and that a new trial is warranted. While he acknowledges that it is an "extremely rare remedy," he maintains that" he was not given his fair day in Court[,]" and "[t]aken as a whole, the record does not support a verdict of guilty." Dixon thus requests that this court order a new trial in the interest of justice. We decline to do so.
¶37. "The exercise of our discretionary power to grant a new trial is to be done infrequently and judiciously." State v. Ray, 166 Wis. 2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992). "The rule often stated by [the supreme] court is that a new trial in the interest of justice will be granted only if there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result."[4] State v. Cuyler, 110 Wis. 2d 133, 142, 327 N.W.2d 662 (1983) (citations omitted and emphasis added).
¶38. Dixon argues: "Without restating each and every agreement [ sic] set forth above, collectively, the agreements [sic] should convince this Court to order a new trial." We have rejected each of Dixon's previous arguments, and his conclusory allegations of injustice do not persuade us to conclude that a retrial will produce a different result or that there has been a miscarriage of justice. Accordingly, we decline to grant a new trial in the interest of justice.
By the Court.-Judgment and order affirmed.
This opinion will not be published. See Wis. Stat. Rule 809.23(1)(b)5.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] Almost in passing, Dixon also contends that the trial court "penalized [him] for maintaining his innocence and going to trial in this matter." He provides no argument or any references to the record to support that bold statement, and as such, we decline to address it. See State v. Pettit, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals may decline to address issues inadequately briefed).
[3] Dixon also fails to cite any legal authority for his claim that the victim's death should not have been considered.
[4] A new trial may also be ordered "whenever the real controversy has not been fully tried." Vollmer v. Luety, 156 Wis. 2d 1, 16, 456 N.W.2d 797 (1990); see also Wis. Stat. § 752.35. Here, however, it appears that Dixon is arguing that there has been a miscarriage of justice.